*In re* GLOCKNER'S WILL.

(*Surrogate's Court, New York County.* July 24, 1888.)

1. WILLS—CAPACITY TO MAKE—EFFECT OF OPIUM.
    The fact that a will was executed while the testatrix was suffering from her last illness, during which, opium, in moderate doses, was given her under the direction of her attending physician, is not sufficient to show want of testamentary capacity, there being no proof that the drug in any way affected her mental powers further than to cause sleepiness when under its influence, or that she was at all affected by it at the time she executed the will.[1]

2. SAME—UNDUE INFLUENCE—EVIDENCE.
    Where a testatrix, by will, divided the bulk of her property between four of her sons, giving the fifth only a small legacy, proof that she had made two previous wills, leaving her property equally to her five sons, and had declared her intention of so leaving it during the same year in which she executed her last will, and evidence to the effect that two of the sons had expressed an intention to exclude their brother from any share in the mother's estate, are insufficient to show undue influence, it appearing that, for weeks before she signed the will, testatrix complained of the excluded son, that she had quarreled with his wife, and that she made the change deliberately with a full knowledge of what she was doing.[2]

On contest of a will.

*Jacob Halsted,* for contestant.   *Ezekiel Fixman,* for proponent.   *Geo. W. Lyon,* special guardian for infant legatees.

RANSOM, Sur.   The paper offered as the will was executed November 2, 1887, when the decedent had been nearly three months an invalid.   The malady was a uterine cancer, from which she died on the 9th of January following.   She left her surviving five sons—two, Nicholas and Peter Hamm, by her first husband, and three, George, Joseph, and Henry Glockner, by her second.   The instrument provides for a gift of $200 to Adam Hamm, the son of her son Nicholas, and bequeaths to Nicholas the amount of his indebtedness to her, which is proven to be between $200 and $300.   The residue of the estate is divided equally between her four sons, Peter, George, Joseph, and Henry.   The property consists of an undivided half interest in the premises, No. 35 Sullivan street, and a farm in Illinois.   The total value is not shown by the evidence, but in the objections filed by Nicholas Hamm it is stated to be about $7,000.   The decedent was a woman of middle age, and the proof shows her to have been of active habits, bright, and familiar with business matters, and very intelligent for one in her station in life.   In support of the allegation of a want of testamentary capacity, proof was given that, during the period of her protracted illness, opium, in moderate doses, was administered under the direction of her attending physician to alleviate her pain; but there was a failure to prove that the drug in any way affected her mental powers further than to cause sleepiness when under its influence; and there was no evidence that she was at all affected by it at the time of the execution of the instrument.   She was more or less out of bed each day prior thereto, and for a considerable time thereafter.   Though she gradually became weaker with the progress of the disease, during most of the time she directed her household affairs, and in the earlier part even assisted the domestic in doing some of the work.   About the 20th of September, she, with her husband, executed a power of attorney to one of her sons to sell their property in Illinois.   As the will had been read to her three times before its execution, twice in English (with which language she was very familiar, having been long a resident of this country) and once in German, she was fully advised of its con-

---

[1] As to testamentary capacity, see In re Bull, *ante,* 52, and note; In re Clearwater's Will, *post,* 99.

[2] As to what amounts to undue influence, and evidence competent on the subject, see Wheeler v. Whipple,. (N. J.) 14 Atl. Rep. 275, and cases cited in note; In re Lansing's Will, *post,* 117 and note; Steadman v. Steadman, (Pa.) 14 Atl. Rep. 406.

tents. She was up and dressed on the occasion of the execution of the instrument, and walked to the table where it was s.gned, and I am convinced that she was at the time in a normal mental condition.

The real question at issue is whether the instrument was procured by undue influence. She had executed two previous wills, one as late as 1885, by each of which her property was given in equal shares to her five sons. In harmony with such a proposed disposition of the estate, declarations of such a purpose are proven to have been made by her as late as 1887. But in the summer of that year a change seems to have come over her feelings in respect to her son Nicholas. On the 4th of July, a month previous to her final illness, she stated to Mrs. Metzinger that "if they (evidently meaning Nicholas and his family) did not behave better, she intended to have things fixed so that Nicholas could not get anything." In September, or early in October, she made a similar statement to Mr. Bentley, one of the subscribing witnesses. Still later she complained that Nicholas was not attentive to her; that h.·sent his son to her with disrespectful messages, which Nicholas denied when examined as a witness; and that he spent his time and money in lager-beer saloons. She also complained that she was neglected by Nicholas' wife, on whom she seems to have relied to some extent to administer to her wants in her enfeebled condition. Finally, some time in October,—the date not being fixed with certainty,—the contestant's wife (Mrs. Hamm) called upon the decedent, and was upbraided by her for not coming sooner. Mrs. Hamm replied that she could not come, because she had her own work to do. This was followed by statements in respect to Nicholas spending his money in beer saloons, and a quarrel ensued which caused the decedent to weep, and the youngest son told Mrs. Hamm that if she did not stop her angry talk he would put her out, and if she went out she should stay out. Mrs. Hamm left the room and did not return until the time of decedent's death, over two months afterwards. The contestant, Nicholas, testified that on the 23d of October he told his mother and his brothers that he would not come there any more, because his wife was ordered out of the house, and that where she was not needed he was not. The decedent's previous dissatisfaction at the course of Nicholas seems to have been culminated in a fixed determination to change her former testamentary purpose, for about this time or soon after she gave instructions to Bentley in respect to the drawing of the will now under consideration. The instructions were taken, with the previous will, to an attorney, who drew up the instrument, and the paper was brought by Bentley to the decedent, some days before its execution, and read to her, and she expressed her satisfaction with its provisions. The paper was left with her, and was produced on the 2d of November, about 10 days after the instructions were given, and was then again read to her in English and translated into German before she signed it. Mrs. Hamm, the wife of the contestant, testified to declarations made by two of the favored sons, indicating a purpose to exclude her husband from any benefaction from his mother's estate. The sons, however, denied having made such statements.· But I fail to see, if they were made, that they had any influence in causing her to change the scheme of her previous will. The proof shows that, weeks previously, she spoke unfavorably of the course of Nicholas, and, whether justly or not, is not important when considered in connection with the whole case, for it is evident that the change was deliberately made with a full knowledge of what she was doing. She lived for more than two months after the execution of the instrument, and seems to have preserved her intelligence to the last.

A decree may be submitted admitting the paper to probate.